Good morning. We have four cases that are scheduled for oral argument this morning. The first is Jimmie Bowen v. Secretary, Florida Department of Corrections. Ivy Ginsberg is here for the appellant, the secretary. Robin Blake is here for Mr. Bowen. And Ms. Ginsberg, you may begin your argument. Thank you, Your Honor. May it please the Court, Ivy Ginsberg, Assistant Attorney General, on behalf of the Florida Department of Corrections. I'm going to rest on my wreath on the exhaustion issue and dive right into the merits that the district court aired in ruling that the state court's denial of Mr. Bowen's suppression motion was an unreasonable application of Rhode Island v. Ennis, Arizona v. Morrow, and Illinois v. Perkins. First, the faculty supported more than the age significance of the requirement of compulsion or coercion that is part of the test outlined in Ennis. The only effort the court used to link coercion in this case was the fact that Mr. Bowen was 16 years old and citing to JDB. And in that case, in JDB, which was a direct appeal case, the case was about whether his status as a juvenile should be considered in the custody factor of Miranda, not in whether it's . . . That was the only factor taken into consideration, his age? For coercion, yes, Your Honor. Because the other factors in the case are similar to many cases where two co-suspects or an informant and a suspect or an undercover agent and a suspect are put in the same room together and it's recorded and the Supreme Court and federal appellate cases have held that that alone is not coercion. The court also took into consideration not just his age, but his mother was there, she leaves, he immediately invokes his Miranda rights, they put him in a room with Mr. Brown, they lied to him about why he was there, and then they recorded by audio and video to get his statements. They were putting him in another room to be taken to the juvenile assessment center, which eventually he was. Now there was testimony by the detective that he also hoped that they would talk, but at no point did the detective suggest to Mr. Jones that he should try and elicit a statement, he should talk to the defendant, there was never any promise of any potential gain. So is it your position that Miranda was not violated or that fair-minded jurists could disagree about that question? It's really both alternative positions and really the question is whether what happened was the functional equivalent of interrogation, and certainly at worst, fair-minded jurists could disagree because there were facts that the trial court could take into consideration that could go either way. Well, if it was, let's say, if he was put there to get him to incriminate himself under circumstances that was reasonably likely to get an incriminating response, then his Miranda rights were violated. Wouldn't that be a true statement? Well, you also have to look at the suspect's perception, not just what the detective's intent was, and we have testimony from the suppression hearing that Mr. Bowen said, I said what I said because I wanted to say it to Mr. Jones. So from his perception, he did not feel that he was being coerced. This was after he had already incriminated himself in the holding cell? The statement that you just referred to, that was the later statement? I'm talking about how he testified at the suppression hearing? Right. And ultimately, that's what the judge had to decide based on the testimony of the detective, the testimony of the defendant's mother, and the defendant's testimony himself. And remember that But if we're faithful to Rhode Island v. Ennis, if it's clear that he was there under circumstances such that it was reasonably likely that he was going to incriminate himself, then there was no error in the district court's decision, right? The State's position, we respectfully disagree. Because you need more than reasonably likely, right? Don't you need . . . Ennis is very focused on the coercive elements of the situation? Yes, Your Honor, and that's very significant, and that's what we're trying to hammer, that as to the coercion, every Supreme Court decision, we've cited on page 46 of our brief, numerous Federal appellate decisions where two defendants are placed together in the same room, and it's recorded, and none of those cases held that was coercive. And that's extended from . . . from Arizona v. Morrow and from the Perkins case. And from this circuit, it's an unpublished decision cited in our brief, but Jackson v. Warden is very persuasive. There, the police secretly recorded the defendant's cell phone calls while he was alone in the interrogation room. And that's no different, really, from what happened here. You agree that if the police had talked to Jones beforehand and said, hey, like, we're going to put . . . we're going to put him in the room with you, see what you can get for us, and we'll give you a good deal. That would be a pretty straightforward Miranda violation, right? Absolutely. So what makes this different in your view? Because the police did not say anything to Jones to try and elicit a statement from . . . Well, they knew he tried to contact Jones. That's why they put him in the cell with Jones. He tried to call Jones to tell him, don't talk. And so that's why they put him in jail, in the lockup room with Jones. Well, it was in the interrogation room at the police station, but that's neither here nor there. But it's possible that they would talk. Perhaps Bowen would have just said, just keep your mouth shut. Don't say anything. And so, for those reasons, there's really . . . it's a possibility, and maybe some judges would say it's a probability . . . that by putting them together, it is reasonably likely that they would elicit an incriminating response. But, again, there was no compulsion in this case, and that is a critical element. And I just want to touch on, also, in determining whether a ruling is determined to be an unreasonable application, the starting point is Yarborough v. Alvarado, cited in our brief. And you look to whether the rule is a specific or a general rule. And the Innis rule, and those following it, is a broad holding that applies to many different fact patterns. And it's hard to pinpoint . . . Well, anyway, it's a broad holding, and the broader the holding, the greater the deference the Federal Court must give to the State Court's ruling. Well, the State Court . . . let's see, the last . . . we looked through . . . we looked through to give EDPA deference to the trial court, right? And I don't see that the State Court even cited any Supreme Court cases in his decision, the trial judge. How do we factor that into our analysis of this case? It was a site-to-estate case, but not a Supreme Court case. This is a Miranda issue. Both sides argued their positions, both in writing and at the suppression hearing. And they both cited to Innis, they both cited to Miranda, they both cited to Michigan v. Mosley. But the most forceful argument they were making at the time was a Fourth Amendment violation. I just don't see that the State judge even relied on a Supreme Court case in making his decision. He relied on a State case, but not a Supreme Court case.  And then the issue went up on appeal. The same things were argued to the appellate court with one member of this court who was on the panel in that case. And they considered the issue, and they affirmed the decision. And that's what we're here for. The decision was affirmed by two State courts, and deference is to be given, despite there's no explanation. Can I ask you a question? Has the Supreme Court ever applied Innis to find a functional equivalent? That is, the Supreme Court created this standard in Innis, functional equivalent. Were you aware of any Supreme Court case that actually found that a functional equivalent of interrogation had actually happened? I'm sure there are. Are you willing? You may not want to concede that just in case. I'm sorry. I'm teasing. I don't know one off the top of my head, because the majority of them found that there was no functional equivalent of interrogation. And I just want to go back to JDB. That court recognized that Alvarado, which was on habeas review, as this case is, where the State court decision failed to mention his age in the analysis, in the cost analysis, was not objectively unfeasible. Does JDB help you, though? I'm sorry? In the case of coercion? I'm sorry, Judge. Let me correct myself. I was talking about the Alvarado case, which was a habeas case prior to JDB, where they did not consider the juvenile's age in determining the custody analysis. And then when JDB came out, they remarked that Alvarado, there was no unreasonable application in that case, even though they did not consider the juvenile's age in determining the custody analysis. And that's what we have here. There's no Supreme Court case that says you must consider the defendant's age in the determination of functional, whether this was a functional equivalent of interrogation. I'll just tell you, I'm not sure that's your best argument, because in Innis, the Supreme Court said that the Innis inquiry about functional equivalent has to be a functional equivalent. And it has to account for, quote, Wouldn't age be a thing you'd have to consider under that phrase from Innis? It might be. It's certainly not clear cut. It's certainly not set in stone. But even if you do consider Mr. Bowen's age in this case, let's look at him and let's look at the record. He was a 16-year-old member of a gang that took out a rival gang member, a 10-month-old baby, and shot two other people that survived. And in the judge's sentencing order, when considering mitigating factors, which the defense argued he should get less than a life sentence because of his age, she said, uh-uh. Biologically, he's 16, but he was a street-savvy, smart kid that had a sophisticated plan to kill all these people. And she rejected the fact, the mere fact that he was 16. And let's look at J.D.B. J.D.B. was 13. And there's a significant difference between those two. Well, if he was really sophisticated, he wouldn't have incriminated himself when he was in the jail cell with Mr. Bowen. Mr. Bowen, Mr. Bowen. Well, I think we have your argument. You've reserved some time for rebuttal. Thank you. We'll hear from Ms. Blake. Good morning, and may it please the Court. Robin Blake on behalf of the appellee, Jimmy Bowen. I'm here to support the district judge's decision because the lower court got it right. And I want to start with the harmless error question and kind of take that out of sequence because I don't want to run out of time. Then I'll get to the 2254D standard, the exhaustion question, and the definition of interrogation and how this fits in that. There was only one question that the jury asked during their five or six hours of deliberation. And that question came right out of the gate. It was as follows. Can we stay? Can we adjourn and come back tomorrow? Can we watch the video in the room? And that's at docket entry 14-9, page 23. And after there was some back and forth because the parties were unsure, they wanted to make sure they were talking about the video that they all thought they were talking about. And then they came back a few pages later here and said, we would like to review the interrogation room audio and video and the phone conversation audio possibly. That was at docket entry 14-9, page 32. So we'll let you know what was in the jurors' minds. This video was the active ingredient in this trial. It was the subject of the entire trial. And the State's rebuttal argument, that's all it was, was taking snippets from the video and just reciting them to the jury. And they said, you can watch this video as many times as you want. And so this statement, which basically amounted to a confession, consumed the whole trial. Arizona v. Fulminante tells us how important confessions are to any jury. And so this is not something that we can just say, oh, it didn't make a difference. There were four other items of evidence that the State had to try to prove this case. I'll just tell you, just speaking for myself, I think you made the argument. So I don't think there's an exhaustion problem. And I think that if there was an error, it was harmful. So I think you went on this issue, too. You've convinced me in your briefs about that. Just speaking for myself, the concern I have is whether we can say that all reasonable jurists would find an Innis violation here. So what do you say about the argument from the State that, look, the Supreme Court identified this language in Innis and said functional equivalent of interrogation. Reasonable jurists could look at what happened here, and some could say it is a functional equivalent, and some could say it's not. What do you say about that? On the 2254 standard, there are four different approaches this Court could take to it. Because the Court's oral ruling from the bench on the suppression hearing, which happened about two weeks after the hearing, she didn't write up a written order. And it was, you could find it at docket entry 14-1, pages 117 to 118. In order for a State court judgment to receive deference, there has to be an adjudication on the merits. If you look at this decision, you can say this was not an adjudication on the merits, because on the Fifth Amendment claim, it wasn't addressed at all. She made a reference to the State case of Calhoun, but that case was in the Fourth Amendment analysis. She referred to the right to privacy, didn't even rule on the Fifth Amendment claim. That's because there's no adjudication on the merits, and so the State deference does not apply. Another way to look at it is that this was a contrary to, instead of an unreasonable application of. Those are two distinct prongs. They tend to get blended together in the case law, but they're separate. Contrary to is whenever the Court does not correctly identify the governing legal principle. Here, looking at the oral ruling, you say, well, she did not identify the governing legal principle. So we're not under the unreasonable application of standard at all in that case, because it is just that she didn't apply the right standards, or we don't know if she did, and therefore there is no deference to be given. The third way of looking at it is the Wilson v. Sellers. Well, Wilson v. Sellers, it came from this Court. It went up to the High Court. You all know about it. This case was where the Court said you have to train your attention on the reasoning. Well, if we just simply look at the reasoning of the State Court's decision, you see, well, she just said, this is not like Calhoun. There was no privacy interest here because it's different, and therefore I'm denying the motion, and didn't give any more explanation than that. The fourth way of looking at it is the way the magistrate below approached it, and that is under Harrington v. Richter, you kind of brainstorm for the Court that didn't give real reasons and decide what could have supported the reasoning. And the magistrate did a methodical approach on that and went through one by one and came to the right conclusion in our contention. All of these approaches lead to the same result, which is that my client prevails. And this Court, you know, is going to climb on any ground that is supported by the record. The four other items of evidence the State had to prove this case, I know you say you're convinced, Judge Brasher, but I'm not sure if your colleagues are, so I did want to make the record on this in case they aren't. I am, too, for what it's worth. I am, too. I'm similarly convinced to Judge Brasher. It sounds like you've got a majority on that. Go back to the EPA framework here. So the State argues that Innis creates this functional equivalent framework. Let's assume we have to give it epidefference. And the State argues, look, this is basically like Strickland or any other kind of constitutional Supreme Court case. It creates the standard, but there's room for interpretation and application of that standard to any particular set of facts. So I guess the first question is, is that what the Supreme Court did in Innis? Did it create sort of a standard that then could be applied to different sets of facts? And then the second question is, if that's right, then why is it that only an unreasonable judge would have reached the conclusions that the Florida judge has reached in this case? Well, if you assume, if you say, okay, well, we're going to assume that this was an adjudication on the merits, if you assume that. But that would have to be a big assumption, because there was nothing to indicate. Well, I mean, if it wasn't an adjudication on the merits, then what was it? I mean, it could have been a bad adjudication on the merits, but I mean, it wasn't like a procedural default or something like that, right? It was not a procedural default, but she addressed the Fourth Amendment claim and sort of forgot about the Fifth Amendment claim. I think this was a conscientious judge. If you look through the motion to suppress hearing, you'll see she asked questions to show that she had sort of an interest in what was going on, said she consulted some colleagues, but did not address the Fifth Amendment claim. Below, we presented the Fourth Amendment claim and the Fifth Amendment claim. We lost on the Fourth Amendment claim, but prevailed on the Fifth Amendment claim. So she adjudicated on the merits on the Fourth Amendment claim, which we're not here about today. So you're saying not that she made a wrong decision on the Fifth Amendment claim, but that she just didn't address it at all? Correct. And based on what she said at the hearing, she might not have applied the correct governing legal principle. What was the Fourth Amendment claim? Remind me. He was in the interrogation room at the police station, not at the jail, but at the police station, and there was an expectation of privacy, we thought, under those circumstances. But that was a close call. We understood the denial on that claim. You did say that that same incident was a Fourth Amendment violation and a Fifth Amendment violation, and you were saying that she only addressed the Fourth Amendment violation. Is that right? Correct. You can find her ruling. And what about the State Court of Appeals? The State Court of Appeals did appeal on Florida's PCA, and it was just PCA'd without any opinion at all, so we don't know. That often happens. You might assume it was the same reasoning that the lower court gave, but you look through, too, under Sellers. Under Sellers, I wonder what you do. I'm not sure if Sellers addresses that, because if the point is that the Fourth Amendment was addressed by the trial court, but not the Fifth Amendment, and then both the Fourth Amendment and the Fifth Amendment were briefed to the Court of Appeals, I'm not sure whether under Sellers we would assume. I don't know that it's right to assume that the Court of Appeals also failed to address a fully briefed Fifth Amendment question. Sellers seems to assume that at least the questions are addressed, probably, but I just don't know if that's covered by Sellers. Well, if it's not, then you have to decide what reasoning could have supported the district judge's reasoning and brainstorm for the state judge, and I think if you do that, there is no way you can say that this did not fit under Ennis. Ennis says any words or actions on the part of police that they knew or should have known were reasonably likely to elicit an incriminating response, and that it is from the perceptions of the suspect. The case focuses on the perceptions of the suspect rather than the intent of the police, and so that's why age is important. But it was just one factor, as Judge Wilson pointed out. The lower court also considered his education level, considered the fact that he had just tried to make a call to the co-defendant minutes before. The co-defendant was Bernard Jones. And the fact that his mother was there at the interrogation saying, don't talk to my son, don't talk to my son. I'm going to leave now. Promise me you won't do anything to try to trick him or trip him up. And under Michigan v. Mosley, the law enforcement has to scrupulously honor the handling of those rights. So let's say, hypothetically, he was not in the jail in the holding cell, but after he was arrested, they put him in the back of the police car with the other co-defendant, and then he didn't realize it, but their conversation was recorded while he was in the back of the police car. What would make this case different from that? That's different because there are many cases on that, and they all reject the argument. But the reason is that usually in those cases, the person has not been Mirandized and has not invoked because they put him in the police car early, right after the arrest. They transport him to the station. This is the typical scenario. And they don't begin questioning or do Miranda until after the fact. When he's in the back of the police car, there's no right to be. It's not the same standard for those rights. You would say if he was Mirandized, though. This is the thing that I'm really struggling with. I ask opposing counsel a question about whether the Supreme Court had ever found something to be the functional equivalent of an interrogation, and I think our answer was incorrect. I don't think the Supreme Court has ever found anything to be the functional equivalent of an interrogation. Am I wrong about that, or is there a case where the Supreme Court has done that? There are some cases in the Sixth Amendment context where the high court has addressed it. Those cases were different because the police put the person onto it. Here, we acknowledge he did not, but by setting them up, putting them in the... Cases like Messiah, for example, Henry, for example. These are cases where it was the Sixth Amendment right to counsel that was at issue and not the Fifth Amendment. What if Miranda asked him before they put him in the back of the police car, before they took him to the station? How would this case be different from that? This case would be different because you would not have had all of the preliminary with the mother, with the attempt to interrogate him, with him informing the police that he did not want to speak, and those things. I think Perkins is probably the best case for Florida in terms of the argument that there's room for jurists to come to different conclusions about whether this was a violation. How do you reconcile what Perkins says about coercion with Innis? In Innis itself, in that case, the police were simply talking in front of the gentleman without any intent to get a statement. Wherever that happens, that's different. That's sort of a face-to-face thing. In other words, the person's reaction is known. He knows the police are there. The police know he's there. They're trying to affect him directly. This recording situation has not come up a lot. It's come up a few times. She pointed out Jackson. But the reason Jackson was different, that unpublished decision from this court, is because they simply had him in the room, picked up his cell phone, started calling somebody, and made some statements. In that case, that wasn't a subterfuge to circumvent his rights. It was just they had no way of knowing he was going to call anybody. They had no way of knowing who he would call. They had no way of knowing. It wasn't calculated the way this was calculated. Didn't the officer say here, look, I needed to put him somewhere. That was the room. And eventually he confessed. The officer said, sure, did I hope he would say something? Yeah, why not? But isn't that, at least for some reasonable jurists, enough to say that he wasn't placed into that situation with the specific intent to somehow compel a confession? No, not at all. Because if you read the transcript, you'll see the officer trying to say he didn't do it for that reason. He's acknowledging guilt. He had a consciousness of guilt to say, oh, it was for this other reason. He's going back and forth. He's contradicting himself. Then he says, okay. When the state made him feel better to say, well, you're a good investigator, you would hope that he would talk. That's a good thing. Oh, yes, yes, that's exactly. I was doing it because it's a good thing. Now all of a sudden he felt comfortable acknowledging the truth and admitting that that's the real reason he did it. No, that was not believed. The district court did not believe it. We don't believe it. I'm asking this court to affirm the well-reasoned opinion of the district court. If there are no other questions, then ... I see no other questions. Thank you, Ms. Blake. Thank you, Judge. Ms. Ginsburg, you have reserved some time for rebuttal. I'll ask you before you get started so I don't take your time. What do we do under Sellers with a trial court opinion that doesn't address the constitutional argument and then a court of appeals opinion that doesn't exist? What do we do with that under Sellers? You assume that both courts reach the merits, as I stated. Why would we assume that the trial court reached the merits? First of all, when they argued Calhoun, Calhoun not only talked about the Fourth Amendment, but they also argued that it was a violation under Ennis under the Fifth Amendment. The court rejected the holding of Calhoun. She said she'd read all the cases and she's concluding that the evidence should be suppressed. Or not suppressed. I believe that you do give deference to the state trial courts. It's the ultimate ruling, not necessarily the reasoning. It's never been argued in Appley's brief. We're hearing this for the first time.  And then I want to talk about what seems to be the critical issue, that you're not sure whether fair-minded jurors could disagree. And I just want to lay out the facts which support that fair-minded jurors could disagree in this case. The facts weighing against interrogation. The police cut off their questioning as soon as Bowen invoked his right to counsel. The detective testified he put the suspect in the same room because they were both being transported to the JAC, which was true. Bowen and Jones were in the room alone. No officer was present. The officer did not tell Jones to try to elicit an incriminating statement. There was no undercover agent, no informant used, no coercion from the suspect's perspective. The facts weighing in favor of finding interrogation, well, this goes both ways, that the officer said he hoped that two suspects would talk about the case, but there's case law that says hope is not enough. Bowen did not know for a fact he was being recorded, but then why was he whispering? The officer knew Bowen called Jones' phone at his age. He was 16, but he was street savvy. He was a gang enforcer. And so I think that there are facts sufficient for fair-minded jurors to disagree on the issue. I know the court has said they don't believe in the harmless error argument, but I'd like to briefly touch on that because everything that Mr. Yarbrough testified to was corroborated, either by another witness or by forensic evidence. Forensic? What was the forensic evidence? Well, okay, Bowen told him that he used a Glock, and Bowen, Yarbrough testified he heard the shots, seven to ten, there were nine casings found, and they were all from a Glock. Well, that establishes that there was a shooting. Well, we have the weapon. How would he know what type of gun was used? They don't know if it's a machine gun, an AK-47, a pistol. So we have the number of shots. We have corroboration that Bowen had a face covering on from Mr. Chester, who was an innocent bystander at the grocery store, saw a white truck, we have a white truck, sees a guy get out, walks down the street, hears a bunch of shots, sees the same guy walk back. So that's corroboration as to those facts. The jail calls were very incriminating that Bowen said, Bowen needs to fail to appear in court or say that he lied because I owed him money. Why would he be saying that? There's no reason for Bowen to say this to somebody else if Bowen had not made the incriminating statements to Yarbrough. And the jail call with Kenny, who was the gang leader, talking about searching the houses for the gun, he says, they're trying to find that gun, but they aren't going to find it. So what else do we have? And then we have the cell phone calls. The same night of the shooting, there were seven to ten calls between Bowen and Yarbrough, and that's corroborated by the fact that it was within a three-mile range. They all lived within a three-mile range of the cell phone tower anyway. Actually, Bowen lived in Carroll City, which is more than a three-mile range. He did not live in those New Rocky projects. All right. We'll look at the record. So respectfully would ask that this court reinstate the commission and vacate the district court's order and find that fair-minded jurists could disagree. And there was harmless error in this case and the alternative. Thank you. All right. Thank you, counsel.